21-00364MB

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, David T. Neill, Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

**INTRODUCTION**

1.      The facts of this case, as more fully detailed herein, are that on or around May 18ᵗʰ, 2021, within the District of Arizona, Serafin JIMENEZ, Roy QUEZADA, and Ivan GASTELUM violated federal law by participating in a transaction involving violations of 18 U.S.C. §§ 554 Illegal Export of Firearms and Ammunition, and 924(c) Possession/Use of Firearm During a Drug Trafficking Crime, Title 21 United States Code §§ 841 & 846, Conspiracy to Possess with Intent to Distribute a Controlled Substance. I am requesting that the Court issue a search warrant to search for evidence of the above violations located in:

 a.      iPhone SE, Model A1662, IMEI: 358633072443977

b.      Blue iPhone, Model A2172, IMEI: 353038117141260

c.      Samsung Phone, IMEI: 355298662014597

d.      Samsung flip Phone, Model SCH-U365, MEID: A0000044AEAEBA

e.      Samsung Phone, IMEI: 356184990652077

f.      Black iPhone 8 Plus, S/N F18W5606JCLY, IMEI: 353009093360935

g.      Black iPhone 7, S/N C7CX9MBKHG7F, IMEI: 353074095715437

(hereinafter "SUBJECT DEVICES") currently located at the FBI office at 275 N. Commerce Park Loop, Tucson, Arizona, and further described in Attachment A, in support of an investigation into the aforementioned crime.

**PRELIMINARY BACKGROUND INFORMATION**

2.      Your affiant, David T. Neill, is a Special Agent of the FBI and is currently assigned

21-00364MB

to the Tucson office. In the course of his official duties, your affiant is responsible for investigating federal crimes occurring within the District of Arizona, which include violent crimes. Your affiant has training and experience in investigating such crimes.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, investigators, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of violations of Title 21 United States Code §§ 841 & 846, Conspiracy to Possess with Intent to Distribute a Controlled Substance are located within the SUBJECT DEVICES as further described in Attachment A. Accordingly, this application requests authority to search the SUBJECT DEVICES as described in Attachment A, for evidence of this crime as described in Attachment B.

4.      This court has jurisdiction over these offenses under 21 U.S.C. §§ 841, and 846 because the below-described events occurred within the confines of the District of Arizona, in both Maricopa County and Pima County, Arizona.

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

5.      The SUBJECT DEVICES to be searched pursuant to the attached Application are described in Attachment A and include:

a.      iPhone SE, Model A1662, IMEI: 358633072443977

b.      Blue iPhone, Model A2172, IMEI: 353038117141260

c.      Samsung Phone, IMEI: 355298662014597

d.      Samsung flip Phone, Model SCH-U365, MEID: A0000044AEAEBA

e.      Samsung Phone, IMEI: 356184990652077

f.      Black iPhone 8 Plus, S/N F18W5606JCLY, IMEI: 353009093360935

2

g.        Black iPhone 7, S/N C7CX9MBKHG7F, IMEI: 353074095715437

Based on my training, experience, and research, I know that the SUBJECT DEVICES have capabilities that allow them to serve as a wireless telephone, digital camera, and possibly a GPS navigation device.

## **DEFINITIONS**

6.        The following non-exhaustive list of definitions applies to this Affidavit and Attachments A and B:

a.        Visual depictions include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  *See* 18 U.S.C. § 2256(5).

b.        Computer means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).

c.        Computer hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices), peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

d.        Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer

software is stored in electronic, magnetic or other digital form.  It commonly includes computer operating systems, applications and utilities.

e.      Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software or other related items.

f.      Computer passwords and data security devices consist of information or items designed to restrict access to or hide computer software, documentation or data.  Data security devices may consist of hardware, software or other programming code.  A password (a string of alpha-numeric characters) usually operates a sort of digital key to unlock particular data security devices.  Data security hardware may include encryption devices, chips and circuit boards.  Data security software of digital code may include programming code that creates test keys or hot keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide or booby-trap protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

g.      Internet Service Providers or ISPs are commercial organizations, which provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage and co-location of computers and other communications equipment.  ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or coaxial cable data transmission, dedicated circuits or satellite based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox and the subscriber typically creates a password for the account.  By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a coaxial cable system, and can access the Internet by using his or her account name and password.

21-00364MB

h.      ISP Records are records maintained by ISPs pertaining to their subscribers (regardless of whether those subscribers are individuals or entities).  These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers and other information, which may be stored both in computer data format and in written or printed record format.  ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers use.  This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files.

i.      Internet Protocol address or IP address refers to a unique number used by a computer to access the Internet.  IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a subscriber's computer at varying intervals at the discretion of the ISP.  IP addresses might also be static meaning an ISP assigns a user's computer a specific IP address which is used each time the computer accesses the Internet.

j.      Digital device includes any electronic system or device capable of storing, processing, interpreting or rendering data in digital form, including computer systems of various form factors (computer desktop systems, towers, servers, laptops, notebooks and netbooks), personal digital assistants, cellular telephones and smart phones, peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors and drives intended for removable media; related communication devices such as wired and wireless home routers and modems; storage media such as electro-mechanical hard disks, solid state hard disks, hybrid hard disks, floppy disks, optical disks such as compact disks and digital video disks, magnetic tapes and volatile and non-volatile solid state flash memory chips; and security devices including dongles and flash chips.

k.      Digital camera:  A digital camera is a device that records still and moving images digitally.  Digital cameras use a variety of fixed and removable storage media to

store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

l.      Cellular telephone:  A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the devices.

m.     GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.

A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

7.      The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.  As described above and in Attachment B, this application seeks permission to search and seize certain records that might be found in the SUBJECT DEVICES, in whatever form they are found.

8.      Based on my knowledge, training, and experience, I know that:

        a.      Wholly apart from user generated files, electronic devices often contain electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and other files.

        b.      As further described in Attachment A, this application seeks permission to locate not only data that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how the SUBJECT DEVICES were used, the purpose of their use, who used them, and when.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

        c.      Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.  Additionally, the examination may require authorities to employ techniques, including but not limited to manually activating the Devices and conducting visual search

of the electronic information described in Attachment B.

9.      Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that segregating information before commencement of the review of digital evidence by the examining agent is inconsistent with the evidence assessment process in investigation involving digital evidence.  This is true in part because the items to be searched will not only contain items of evidence, but also will contain the identity of the user/possessor of the electronic items which may be located throughout the areas to be searched. In addition, it is not possible to know in advance which computer(s) and storage media will contain evidence of the specified crime, and often, such evidence is contained on more than one computer or digital storage device. Further:

a.      Searching digital devices can be a highly technical process that requires specific expertise, specialized equipment and knowledge of how electronic and digital devices are often used.  There are so many types of digital devices and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.

b.      Because of the numerous types of digital devices and software that may contain evidence in this case, it may also be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, software application or operating system that is being searched in an off-site and controlled laboratory environment.

c.      Because the absence of particular data on a digital device may provide evidence of how a digital device has been used, what it has been used for, and who has used it, analysis of the digital device as a whole may be required to demonstrate the absence of particular data.  Such evidence of the absence of particular data on a digital device is not segregable from the digital device.

d.      The types of evidence described above may be direct evidence of a crime,

indirect evidence of a crime indicating the location of evidence or a space where evidence was once located, contextual evidence identifying a device user, and contextual evidence excluding a device user.  All of these types of evidence may indicate ownership, knowledge, and intent.  This type of evidence is not "data" that can be segregated, that is, this type of data cannot be abstractly reviewed and filtered by a seizing or imaging agent and then transmitted to investigators.  Rather, evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how a device behaves and how devices are used.  Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

10.    Because it is expected that the SUBJECT DEVICES may constitute (1) instrumentality of the offense or (2) fruit of criminal activity, it is anticipated that such evidence will not be returned to the owner and that it will be either forfeited or ultimately destroyed in accordance with the law at the conclusion of the case.  However, if after careful inspection investigators determine that SUBJECT DEVICES do not contain (1) instrumentality of the offense, (2) fruit of criminal activity, or (3) evidence of the person who committed the offense and under what circumstances the offense was committed, then such items seized will be returned.

## DETAILS OF INVESTIGATION

11. The United States, including the Federal Bureau of Investigation ("FBI") is investigating allegations that cartel members and associates, including Serafin JIMENEZ, here after referred to as JIMENEZ, Roy Guadalupe Marquez QUEZADA, here after referred to as QUEZADA, as well as members and associates of Cartel De Noreste ("CDN"), are conspiring with each other, and other individuals yet unknown, to transport and distribute controlled substances, namely methamphetamine, and firearms to United States border cities. The firearms are being used in furtherance of drug trafficking in the United States and Mexico and are being transported into the Republic of Mexico. The investigation has revealed JIMENEZ has coordinated a narcotics transaction and a

firearms transaction in furtherance of drug and firearms-trafficking activity in both the Western District of Texas and the District of Arizona, and is presently negotiating with a FBI Undercover Employee (UCE) to conduct another transaction in the District of Arizona.

12. The FBI is aware that JIMENEZ and other coconspirators of the CDN and rival cartels are distributing methamphetamines and firearms to various cities located on the United States border in order to transport the contraband to cartel members in Mexico.

13. Previously, at the direction of the FBI, with information obtained from an FBI confidential source (CS), an UCE purchased approximately 732.5 grams of methamphetamine from JIMENEZ and his co-conspirators on or about November 12, 2020 in Phoenix, Arizona. Both the UCE and CS communicated with JIMENEZ, via cellular telephone, in order to set up and coordinate the transaction. A number of these calls were recorded.

14. On or about November 12, 2020, while conducting the narcotics transaction, the UCE made a telephone call to JIMENEZ. The UCE and JIMENEZ discussed the pending methamphetamine transaction, during which the UCE agreed to purchase approximately 1 kilogram of methamphetamine from JIMENEZ for approximately $5,200. JIMENEZ advised that he was approximately twenty ("20") minutes away and was driving a black dually. Approximately 30 minutes later the UCE again spoke with JIMENEZ via cellular telephone, and JIMENEZ advised he was just leaving Paradise Valley and still needed to pick up the methamphetamine. Approximately 30 minutes later, the UCE received a telephone call from an individual later identified as QUEZADA. QUEZADA advised that he was calling on behalf of JIMENEZ and advised that he had approximately ½ kilogram of methamphetamines and would be driving a Chrysler 300. The above-described telephone call was recorded. A short time later, QUEZADA arrived in a Chrysler 300 with an Arizona Registration and provided the UCE with approximately 225.6 grams of methamphetamine. Surveillance was maintained of QUEZADA as he departed the location of the transaction. QUEZADA was observed to travel to 3115 North 52nd Parkway in Phoenix, Arizona. QUEZADA exited his vehicle and was observed to remove a child

from the back seat of the vehicle and carry the child into the residence.

15. Shortly after the transaction, JIMENEZ called the UCE to confirm that the transaction with QUEZADA was complete, and to advise the UCE that he had obtained the additional ½ kilogram of methamphetamine. A second transaction, also coordinated through and by JIMENEZ, was conducted on the same date to obtain an additional approximately 456.9 grams of methamphetamine. The second transaction was conducted by two unidentified Hispanic males driving a white colored Nissan Altima with Arizona Registration.

16. On or about January 14, 2021, the FBI, through CS initiated another transaction with JIMENEZ. In an unrecorded call, JIMENEZ told CS that he would deliver firearms and narcotics in San Antonio, TX on or about February 23, 2021. During an unrecorded call, CS informed JIMENEZ that the firearms would be provided to the CDN in the Republic of Mexico. On or about January 19, 2021 and January 27, 2021, in subsequent text message conversations, CS and JIMENEZ, while using cellular telephones, discussed the delivery. Text messages received from the target phone confirmed the intended delivery. The UCE, and JIMENEZ also engaged in a series of telephone calls to arrange the narcotics transaction, which was intended to be transported to Texas border cities and distributed. On or about February 16, 2021, the UCE coordinated with JIMENEZ the specifics of the controlled sale of narcotics and firearms in San Antonio, Texas. On or about February 20, 2021 the UCE, in a recorded telephone call with JIMENEZ, again using cellular telephones, coordinated the sale of one .50 caliber firearm, five AK-47s and approximately five kilograms of methamphetamines. The negotiated price was approximately $26,500 United States Currency. The above firearms and narcotics transaction was originally scheduled to occur in February of 2021; however it was rescheduled to a later date and the location was changed to Tucson, AZ.

17. The FBI, through CS, have continued to coordinate with JIMENEZ, regarding the sale of narcotics and methamphetamine in Tucson, Arizona. On April 30, 2021, CS coordinated with JIMENEZ, via text message, to update the order and coordinate the sale of four AK-47 rifles, four AR-15 Rifles, one .50 caliber firearm, and approximately eight

21-00364MB

kilograms of methamphetamines. CS also confirmed with JIMENEZ that the transaction was scheduled to occur on or about May 18, 2021 in Tucson, AZ.

18. On or about May 4, 2021, the UCE received a missed telephone call from the phone number QUEZADA used during the initial transaction in November. On or about the same date, CS spoke with JIMENEZ, who advised that JIMENEZ's "warehouse guy", who was the first individual to deliver narcotics to the UCE in Phoenix, known to Law Enforcement as QUEZADA, had tried to call the UCE, utilizing QUEZADA's phone number, as QUEZADA would be delivering the firearms and narcotics to the UCE in Tucson, AZ.

19. The CS continued to coordinate with JIMENEZ via cellular telephone to confirm the firearms and narcotics transaction in Tucson, AZ. On or about May 10, 2021, JIMENEZ confirmed with the CS that he would be able to provide four ("4") AK-47s, four ("4") AR-15s, and eight ("8") kilograms of Methamphetamine for approximately $26,000. The CS confirmed with JIMENEZ that the transaction would take place on or about May 18, 2021, in Tucson, AZ. JIMENEZ told the CS that QUEZADA would be reaching out to the UCE to coordinate the transaction.

20. On May 15, 2021, the UCE conducted a telephone call with QUEZADA regarding the narcotics and firearms transaction. The UCE confirmed that he is scheduled to pick up the merchandise in Tucson, on Tuesday May 18th. QUEZADA acknowledged knowing the UCE. The UCE asked for the merchandise to be wrapped really good in some sort of blankets. He also asked if the merchandise would be disassembled. QUEZADA advised that he had not yet acquired that merchandise and had advised the "Big Guy" of that fact. The UCE expressed his concern about the exchange because that merchandise is more delicate. QUEZADA then asked the UCE if the deal was for "8" and the UCE answered 'YES'.

21. It is believed that the "merchandise" discussed in the above-mentioned telephone call is referring to the firearms. It is also believed that when QUEZADA asks if the deal was for "8", he is referring to the 8 kilograms of methamphetamine that had been ordered.

22. On May 15, 2021, the UCE conducted a telephone call with JIMENEZ regarding the narcotics and firearms transaction. The UCE advised JIMENEZ that he had just spoken

21-00364MB

to QUEZADA. He asked him about the additional merchandise and JIMENEZ advised that he would take care of that and would get the items to QUEZADA. JIMENEZ had not made QUEZADA aware of that yet but ensured the merchandise would be wrapped in towels.

23. A review of phone records obtained via Federal Court Order for a Pen Register Trap and Trace Device (21-08511MB), identified that a telephone call was conducted between JIMENEZ and QUEZADA approximately 1 and ½ hours after the conversation the UCE.

24. On May 18, 2021, JIMENEZ communicated with the UCE to coordinate the narcotics and firearms transaction. JIMENEZ told the UCE that he could not reach QUEZADA, and that QUEZADA had the firearms. The UCE indicated he would go forward with just a methamphetamine purchase. JIMENEZ agreed to sell the UCE approximately twelve pounds of methamphetamine for approximately $30,000. JIMENEZ agreed to deliver the methamphetamine himself. JIMENEZ said he would be the passenger in a vehicle that would meet the UCE in Tucson. JIMENEZ communicated with the UCE utilizing both telephone calls and text messages.

25. JIMENEZ travelled toward Tucson, AZ, where he met with the UCE in person, near Ina Road and Interstate 10 in Marana, Pima County, AZ. JIMENEZ arrived to the area with two other individuals, later identified as Ivan GASTELUM and Francisco Garcia, who was identified as a "heat driver" and released. JIMENEZ arrived in a black colored Nissan Armada, GASTELUM arrived in a red colored Ford Expedition, and Garcia arrived in a white colored Ford pick-up truck. The three vehicles arrived to the area around the same general time. JIMENEZ and Garcia were the sole occupants in their respective vehicles. GASTELUM had a child in the rear seat of his vehicle. JIMENEZ met with the UCE at GASTELUM's vehicle, the Ford Expedition. JIMENEZ delivered approximately twelve pounds of a crystal-like substance, believed to be methamphetamine, to the UCE, which were located inside of a cardboard box inside of GASTELUM's vehicle. The UCE explained that the "Noreste," referring to the CDN, wanted firearms in Mexico, and the UCE needed to provide them. JIMENEZ indicated that he was still willing to sell firearms to the UCE and suggested another exchange. JIMENEZ and GASTELUM were arrested

13

by the FBI after the transaction.

The scene was processed, during which the following cellular telephones were located inside of GASTELUM's vehicle:

a.      iPhone SE, Model A1662, IMEI: 358633072443977

b.      Blue iPhone, Model A2172, IMEI: 353038117141260

c.      Samsung Phone, IMEI: 355298662014597

d.      Samsung flip Phone, Model SCH-U365, MEID: A0000044AEAEBA

26. The Nissan Armada was towed back to the Tucson office of the FBI. An inventory search was conducted of the Nissan Armada that JIMENEZ was driving, during which a Samsung cellular telephone bearing IMEI 356184990652077 was recovered from the center console of the vehicle.

27. JIMENEZ was interviewed post-Miranda and admitted to his involvement in the transaction. JIMENEZ He stated that he had spoken with an individual from Texas, and told the individual from Texas that he (JIMENEZ) could sell him AR-15s and AK-47s for approximately $1,200 and grenades for $400. After speaking with the individual from Texas, JIMENEZ reached out to QUEZADA to help him acquire the weapons as well as methamphetamine. QUEZADA agreed to provide JIMENEZ with approximately eight (8) pounds of methamphetamine to sell to the Texas buyers. On the day prior to the transaction, JIMENEZ called QUEZADA to confirm if he had the methamphetamine, however QUEZADA did not answer his calls. JIMENEZ reached out to GASTELUM, who agreed to provide him with the methamphetamine to sell to the Texas buyers. JIMENEZ stated that he relayed to the Texas buyers that he could not obtain the weapons, but agreed to sell them approximately fourteen (14) pounds of methamphetamine. On the day of the transaction (May 18th, 2021), JIMENEZ received a phone call from GASTELUM who told him to meet at the Circle K gas station near 50th Street and Chandler Boulevard. JIMENEZ met GASTELUM, and observed that GASTELUM had his son in the vehicle. A short time later, GASETLUM's contact arrived in a white ford F-

2cd9ba39f127dcf2

150 and provided GASTELUM with a box containing methamphetamine. The three of them then travelled to Tucson, Arizona to conduct the transaction.

28. On May 18th, 2021, QUEZADA was arrested by the FBI, during which two (2) cellular telephones being a black iPhone 8 Plus bearing IMEI 353009093360935, and a black iPhone 7 bearing IMEI 353074095715437, were recovered.

29. QUEZADA was interviewed post-Miranda and acknowledged knowing JIMENEZ for approximately 10 years. QUEZADA stated that several weeks prior he had received a phone call from JIMENEZ asking him if he could acquire eight (8) to nine (9) pounds of methamphetamine, four (4) AK-47s, and four (4) AR-15s. JIMENEZ also asked him if he could deliver the drugs and guns to a contact in Tucson, Arizona. QUEZADA stated that the plan was to split the profit with JIMENEZ and he told JIMENEZ that he would try and locate the methamphetamine, however QUEZADA said that he never actually did. After JIMENEZ proposed the deal to QUEZADA, he received a phone call from a person who went by "El Bueno", who pressed QUEZADA to get guns and methamphetamine for the deal that JIMENEZ had set up. Several days before the transaction was supposed to occur, QUEZADA received another phone call from a person, who identified himself as the person he was supposed to meet in Tucson. QUEZADA claimed that he never agreed to any deals and just went along with the conversation with no intention of actually delivering the product requested. QUEZADA stated that he had received a text message from JIMENEZ saying that he was letting JIMENEZ down and JIMENEZ was going to lose a twenty five (25) to thirty (30) thousand dollar connection because of QUEZADA. QUEZADA was adamant that he had nothing to do with the transaction and stated that he had proof on his cellular telephone that he never answered any calls or text messages. QUEZADA provided the pass codes to his cellular telephones, and told the FBI that there was evidence on his phone showing that he was not involved.

30. The examination of the Target Telephone may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant. Because this warrant only seeks permission to examine

21-00364MB

a device already in the possession of FBI, the execution of this warrant does not involve the physical intrusion onto any premises. Consequently, there is probable cause for the Court to authorize execution of the warrant at any time in the day or night. I request that a warrant issue allowing for the search of the Target Telephone, as described above.

## CONCLUSION

31. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that the previously seized SUBJECT DEVICES will contain evidence described in Attachment B in support of an investigation related to violations of Title 21 United States Code §§ 841 & 846.

Respectfully Submitted,

DAVID NEILL

Digitally signed by DAVID NEILL
Date: 2021.07.22 13:54:45 -07'00'

Special Agent David Neill
Federal Bureau of Investigation

Subscribed and sworn telephonically to me
this 22 day of July, 2021

Honorable Eric J. Markovich
United States Magistrate Judge